Nott, J.,
delivered the opinion of the court:
This is an action brought by John C. Frémont on his own behalf, and also for the use of John Roach and another, execu *254 tors of John. Baker, deceased, to recover $46,666 67, being tbe balance due upon a certain contract made by one Adam Johnson, a sub-Indian agent of tbe defendants.
Tbe facts of tbe case are, briefly, these: In 1861 General Fré-mont sold to one Adam Johnson, a sub-Indian agent in California, 1,200 cattle and 1,000 half sacks of flour; Tbe cattle and flour were bought under a pressing emergency, to feed tbe Indians which tbe government bad recently removed to certain reservations. For tbe purchase drafts were drawn in favor of General Frémont to tbe amount of $90,000, and tbe drafts were endorsed over and passed to various persons before presentation, and for a valuable consideration.
These drafts were all dishonored by tbe government; but Congress subsequently, by a series of enactments, gave a legislative recognition of tbe obligation of tbe government to provide for tbe wants of these Indians, and an implied ratification to tbe unauthorized acts of their agents. Tbe ratification went only to tbe extent of paying to tbe actual parties in interest tbe actual value of tbe goods purchased.
Tbe subject is not a new one here. It first came before this court in Jackson’s Case, (1 C. Cls. R., p. 260.) Tbe court held that tbe action could not be maintained on tbe drafts, but that an action might be maintained in tbe name of tbe original party to tbe contract, so as to protect tbe equitable right of tbe holders of tbe drafts. Accordingly a new action was brought by Frémont for tbe use of Jackson. Tbe court there fully examined tbe subject and gave an elaborate history of tbe transaction. It also fixed tbe value of tbe property sold at $60,000 instead of $90,000, tbe contract price, and rendered judgment in favor of tbe claimant for two-thirds of tbe drafts which tbe real parties in interest held. (2 C. Cls. R., p. 461.)
Tbe next proceeding before tbe court was tbe bringing of this action, in tbe name of Frémont, for tbe use of Boacb et al., executors of John Baker, deceased. Subsequently tbe petition was amended so as to include a demand covering General Fré-mont’s own rights as owner of tbe remainder of tbe drafts. In tbe former suit for tbe use of JacJcson et al., $20,000 of tbe drafts were produced and allowed. General Frémont now seeks to recover, for tbe use of himself and others, two-tbirds of tbe amount of tbe remaining $70,000. In tbe former suit *255 everything was settled, both, of fact and law, except tbe simple question of tbe ownership of tbe outstanding drafts.
General Frémont now produces in bis own right, having, as endorser, taken them up, six drafts, amounting in tbe aggregate to $14,000. We think these are sufficiently proven, and that they should be allowed.
He also shows, by the testimony of Mr. George W. Wright, now of Washington, but formerly a member of the California banking-house of Palmer, Cook & Co., that $14,000 more of the drafts were held by Mr. Wright, and paid by General Fré-mont. These drafts are not produced, but Mr. Wright testifies that they are now among his papers if they are not lost ; that he has made diligent search for them, but has not found them; and that, if they can be found, “they are the property of General Frémont.” Coming from a responsible witness, and taking into account the long time which has elapsed without their being produced by other parties, we think the evidence here sufficient, and that General Frémont should also recover for these.
There remain, then, drafts to the amount of $42,000, upon which the action is brought to the use of the executors of John Baker. One of these is for $30,000, indorsed by Frémont to the order of Felix Argenti & Co.; by Argenti & Co. to the order-of Henry Dwight. But there the endorsements stop, and there is no endorsement of Henry Dwight, neither general nor special, to the order of John Baker. There are, also, two other drafts for $5,000 each, and one for $2,000, endorsed in like manner to Henry Dwight, and by him specially to the order of C. Schenk & Co.; but C. Schenk & Co. do not endorse either generally or specially.
How these $42,000 of drafts ever became the property of John Baker is not shown. There is a petition to Congress of Baker and others in the record, setting forth their claims and asking relief, but it is equivocal, and merely states that the petitioner “ holds $42,000 of these drafts.” There is the testimony of Mr. Brooks and others that Baker held these drafts in 1859 and 1860, and that “ he seemed to have control of them.” There is, finally, the testimony of Mr. Coles Morris, the attorney-at-law of General Frémont, who states :
“A suit was commenced against General Frémont upon these drafts in the Supreme Court of this State a number of years *256 ago, on bebalf of Orestes Quintará, by John Baker, appearing as Ms attorney; tbe suit was defended by me on bebalf of General Frémont, and before it was reached for trial an arrangement was made by me for General Frémont with tbe said John Baker, who claimed at tbe time to own these drafts, individually, by virtue of an assignment from Quintará to him, which he showed to me.”
Mr. Morris also says, “Mr. Baker agreed to discharge General Frémont from all persoual liability as endorser on these drafts, and thereupon and in pursuance of that agreement I erased General Frémont’s name as endorser on the back of each of these drafts.”
General Frémont claims to be still the owner of these drafts to the amount of $10,000 so paid by him.
But this does not in any way establish an interest in Baker. The assignment alluded to by Mr. Morris is not produced, and the parol evidence to show its contents was objected' to, and if not objected to would still be insufficient. The contract and possession exercised by Baker, and apparently relied upon, are also explained and overthrown by this testimony, which shows that Baker became possessed of them as attorney to prosecute a suit thereon, and leaves a very strong presumption that the drafts never were his property.
But, apparently, the claimant, on bringing the action, has erased all of the endorsements, and relies upon his holding them as payee. The rule which allows apayee of negotiable paper to strike out subsequent special endorsements, and which j>resumes ownership from possession, does not extend to an action brought by him as trustee in the right of another. Here we are not inquiring into the right of the payee to these drafts, but into the right of one claiming to be a subsequent endorsee. His claim of title by endorsement stops short of himself, and the evidence which has been produced raises a different presumption. We must, therefore, conclude that these $42,000 of drafts were not, in fact, the property of John Baker; and that his executors and the claimant on their behalf have wholly failed to establish a valid or equitable claim to them.
It is also to be noted that the government does not occupy the position here of an ordinary debtor desirous of taking up an outstanding note or liability. On the contrary the govern-ment is not interested in settling with the mere holder of these *257 drafts, or with one who has acquired them without a valuable consideration. What Congress ratified and undertook to perform was paying the actual value of the property received to those who have actually made advances upon the faith of the transaction. There was no legal obligation in the affair; the case is one of equity and not one of law. Congress have impliedly limited the relief to those having an equitable claim upon the government, and the rules which pertain to commercial paper in the transactions of merchants cannot control the court in giving this equitable relief.
There still remains one branch of the case to be considered. General Frémont charges in his amended petition that he has made advances upon these $42,000 drafts. The testimony of Mr. Morris shows the extent and nature of that advance — that it was $10,000 paid to be released as endorser. It may be that, as between General Frémont and the real owners of the drafts, this was a valid and binding payment, entitling him to a joint interest with them in the avails. But as the case now stands, it would seem to be a payment made in his own wrong to parties who did not own them, and who were not entitled to recover upon them.
The judgment of the court is that John C. Frémont be deemed and adjudged entitled to recover the sum of $46,666 (two-thirds of $70,000) upon the original contract and upon the drafts produced and accounted for in this action and filed with the court; that the certificate of the judgment pf the court issue to him for $18,666, recovered in his own right upon $28,000 of the said drafts produced and accounted for; that as to the remaining $42,000 of the $70,000, payment and further proceedings be suspended until the real parties in interest and equitably entitled to the same be brought before the court and their rights adjudged.
Loring, J.
In this, as in the original case, I think the defendants entitled to judgment.